IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHERYL HEIM                                    :        CIVIL ACTION
                                               :
      vs.                                    :
                                               :
LIFE INSURANCE COMPANY OF                      :        NO.  10-1567
NORTH AMERICA

MEMORANDUM

Ditter, J.                                                      March   21, 2012

      Plaintiff, Sheryl Heim, seeks payment of long-term disability benefits by defendant, Life

Insurance Company of North America ("LINA"), pursuant to ERISA section 502(a)(1)(B).  The

parties' cross-motions for summary judgment are before me.  For the reasons that follow, I will

deny LINA's motion,  grant Heim's motion in part, and remand the case to LINA to determine

benefits under the "any occupation" standard.

**I.  FACTS**

      Heim participated in a long-term disability ("LTD") benefits plan sponsored by her

employer, the Reading Hospital and Medical Center.  LINA issued the LTD policy and

administered claims for LTD benefits.  Pursuant to the LTD policy, an employee is considered

disabled because of sickness if she is unable to perform the material duties of her regular job and

unable to earn eighty percent or more of her "indexed earnings" from working in her regular job.

After disability benefits have been payable for twenty-four months, an employee will be

considered disabled only if she is unable to perform the material duties of *any* occupation for

which she may reasonably become qualified based on education, training or experience.

      Heim worked as a nurse at the Reading Hospital beginning in 1996 and served as a

cardiac rehabilitation nurse from 2001 until she stopped work on July 28, 2008.  She filed the

claim at issue for LTD benefits in October 2008.  At the time of her claim, she suffered from

Sjogren's syndrome, a chronic inflammatory autoimmune disease that is characterized by dryness

of mucous membranes especially of the eyes and mouth and by infiltration of the affected tissues

by lymphocytes.  This syndrome is often associated with rheumatoid arthritis.  Heim ceased work

due to fatigue, polyarthralgia (pain in multiple joints), weakness and cognitive complaints.

**A.  Initial Claim**

Heim submitted various supporting documents with her application for benefits.  In her

letter to LINA, she explained her twenty-nine-year history of autoimmune disease and Sjogren's

Syndrome.  She noted that in 1981 "the onset of profound relentless fatigue arthralgias, myalgias[1]

and low grade fevers" prevented her from working full-time and she consequently reduced her

hours to 24-40 per week.

Heim reported severe fatigue and pain in June 2008.  She saw her primary care physician

who conducted an ANA test[2] that showed levels of 1:1280, an increase from her May 2007 test

result of 1:80.  He referred Heim to her rheumatologist, Dr. David L. George, who had been

treating Heim since at least June of 2002.[3]

---

[1]Arthralgias refer to joint pain and myalgias refer to muscle pain.

[2] The parties' agreed statement of facts explains: "Antinuclear antibodies or autoantibodies react with components and especially DNA of cell nuclei and tend to occur frequently in connective tissue diseases (as systemic lupus erythematosus, rheumatoid arthritis, and Sjorgen's syndrome)."  SOF at ¶19(a), n.3.

[3] Dr. George filled out LINA's Medical Request Form, checking yes in response to the question "Have you treated your patient for his impairment prior to this episode?" and filled in June 3, 2002 as the date of that treatment. LH 00238.   Citations to "LH" refer to the Administrative Record that is Bates Stamped "LINA_HEIM 00001 to 000497.

Heim provided LINA with Dr. George's notes of her office visits.  At her June 2008 visit,

Dr. George noted it had been over a year since he had last seen Heim and that she had

"worsening of previous symptoms of fatigue, arthralgias [joint pain], weakness, as well as new

cognitive symptoms."  He recorded mildly reduced sensation in her fingers and toes and observed

that she had "marked gel in the hips and knees, but no upper body stiffness."  He noted her

specific examples of memory problems and that she was trying to take walks to build up her

stamina but could walk a maximum of one mile.  He stated she had a "markedly positive ANA

1:1280 but with normal sedimentation rate and CRP."[4]  He prescribed Inderal for tremor control

on work-days, Alprazolam as-needed for anxiety, 40 mg of Prednisone, an antiinflammatory and

immunosuppressant, and dietary supplements of Centrum tablets and CoQ10.

Heim was seen by Dr. George twice in July of 2008.  At the earlier appointment, he noted

that Heim "had marked fatigue, arthralgias, and cognitive impairment [with] problems organizing

and with short-term memory."  She relayed trouble concentrating, organizing, and problems with

short-term memory persisted, but Dr. George noted there was some improvement in symptoms

from her last visit attributed to the Prednisone.  Dr. George presumed an "immune mediated

---

[4] The Attorney's Textbook of Medicine defines the "Erythrocyte sedimentation rate" as: "a measure of the rate at which red blood cells settle in a tube following the addition of an anticoagulant. Increase in the normal rate of 1 to 20 millimeters per hour suggests inflammatory, infectious or neoplastic disease. This test is beneficial in distinguishing between poylmyalgia rheumatica (a poorly understood condition usually found in women over the age of 50), which is associated with an elevated ESR, and fibromyalgia (a muscular rheumatism), which is not.  5-15 *Attorneys' Textbook of Medicine (Third Edition)* at 15.30  CRP stands for C-reactive protein test, which is a "marker of systemic inflammation" and can be used to determine rheumatoid arthritis. *See e.g., Id.* at 19.20.  ("Acute-phase reactants reflect the degree of inflammation nonspecifically and are often elevated in rheumatoid arthritis. These include the erythrocyte sedimentation rate and levels of C-reactive protein and serum immune complexes. Antinuclear antibodies are often positive in patients with severe rheumatoid arthritis (up to 37 percent in one study) but are not specific for the disease."

cause of her current symptoms" and prescribed 50 mg of Imuran per day to be increased to 75mg daily after one week.[5]  He also tapered her Prednisone to 30mg and then to 25mg daily.

Heim had an MRI of her brain on July 2, 2008.  Dr. George noted that "[a]bnormal CNS MRI was observed showing periventricular white matter abnormalities."  Heim reported difficulty with thinking, concentration and organization and stated she didn't think she could work anymore.  Dr. George noted that she "continues to have problems with marked fatigue, arthralgias, cognitive difficulties which is making daily function most difficult.  She is considering applying for disability."

In August of 2008, she reported continued fatigue, but with several days of feeling good and less aching in her knees.  However, at her appointment she felt weak and unsteady which Dr. George noted was "not vertiginous."  He noted her mildly reduced sensation in her fingers and toes and her unsteady Romberg (test of equilibrium where patient stands with feet together and eyes closed).  He increased her dosage of Imuran from 75mg to 100mg per day and continued to taper Prednisone.

In addition to Dr. George's office visit notes, Heim also provided LINA with the July 2, 2008 MRI report of her brain.  The report noted "foci of increased signal intensity within the periventricular white matter" and described this as a "nonspecific finding."  In addition, she submitted a medical request form completed by Dr. George that noted her diagnoses as polyarthralgia, Sjogren's syndrome, cognitive impairment, and fatigue.  He stated she was unable

---

[5] "Imuran is an immunosuppressive antimetabolite indicated for the management of severe, active rheumatoid arthritis." *Mendez v. Chater*, 943 F. Supp. 503, 505 (E.D. Pa. 1996) (citing *Physicians' Desk Reference*, 1110 (50th ed. 1996)).

to return to work due to cognitive problems, citing trouble with memory and completing tasks.
He did not discuss any physical limitations.

Heim also completed LINA's "Activities of Daily Living Questionnaire."  She stated she
lives in a single-story house and is married.  She indicated that she is able to drive short distances
of less than 30 miles and that she: cooks one to two hours a day, two to three days per week;
cleans for four hours one day each week; does laundry for four hours one day each week; and
shops for one hour each week

Heim attached two single-spaced pages addressing the questions of why she cannot work
and what she discussed with her physician regarding her ability to work.  She noted that she has
very dry eyes that are worse while at work, has had to push herself to keep working over the past
year, has experienced exhaustion and an inability to do anything when she comes home from
work or on her days off, and is unable to keep up with household chores.  She noted problems
concentrating and remembering beginning in June 2008 and that she gets overwhelmed.  Heim
also provided specific examples of her fatigue and pain and noted that she had applied for Social
Security.  She concluded:

> I have worked having this disease since 1980 despite neuropathies, dry eye, dry
> mouth, muscle and joint pain, profound fatigue, essential tremor and more
> recently hearing loss and cognitive changes.  My condition has been worsening
> since the summer of 2007.  Since the onset of the flare-up of my disease in June
> 2008, I can no longer meet the demands of a job with the physical problems I
> have.

On October 26, 2008, prior to LINA's determination of her claim, the Social Security
Administration found her to be totally disabled and awarded benefits, a notably expeditious
determination in a case based on subjective symptoms.

5

LINA denied Heim's claim on December 22, 2008, stating "the medical information does not support restrictions and limitations which would preclude you from performing your regular occupation."  The letter summarized the medical information from Dr. George, noting that Heim was "experiencing worsening fatigue, arthralgias, and some cognitive difficulties."  However, LINA found that "the examination findings provided by Dr. George do not include any documentation of neuropsychological testing that would provide clinical evidence of your functional impairment.  There are no functional deficits to demonstrate a cognitive loss that would support your inability to perform your regular occupation."

**B.  First Appeal**

Heim appealed the denial on March 29, 2009, and submitted additional information including her own letter setting forth the background of her symptoms and conditions; additional office notes from October 2008 through January 2009; a letter from Dr. George; and, a letter from a psychologist, Paul E. Delfin, Ph.D., who had examined her.  Heim explained in her letter to LINA that she had a 29-year history of autoimmune collagen vascular disease and Sjogren's syndrome,[6] noting a significant increase in fatigue and malaise in 2007.  Heim also described a significant decrease in the spring of 2008 in her ability to recall information, to concentrate, and to absorb new information.

Dr. George's office visit note of October 23, 2008, states that Heim reported no improvement in memory, a few weeks with higher energy but that she was currently not feeling well, and pain and stiffness that was not improving.  Her physical exam revealed mildly reduced

---

[6] Heim's medical history is also recorded in Dr. George's July 3, 2008 Office Notes (LH 00337-39).

sensation in some fingers and toes. He noted some neurologic dysfunction with cognitive impairment and planned formal neuropsychological testing and a repeat MRI. Heim continued to take Imuran, Prednisone and Inderal.

Dr. George's December 18, 2008 office visit notes reflect that Heim reported trouble with organization and was frustrated after seeing a neurologist who had no specific recommendations. She relayed problems with simple calculations, but Dr. George noted that she was able to count in serials and perform multiplication, although she was distressed at how slowly she did so. He did not observe any abnormalities in the physical exam. Heim had stopped taking Prednisone but reported no difference in how she felt. Dr. George ordered that her Imuran be tapered and stopped and added 1000mg of Flax Seed Oil to be taken twice daily.

Dr. George's January 29, 2009 office visit notes show that Heim reported no energy, that her repeat MRI showed no progression, that her counting was again good, and that she was clinically stable.

The formal neuropsychological evaluation was performed by Dr. Delfin. He submitted a letter summarizing his assessment dated February 6, 2009. He administered the Wechsler Adult Intelligence Scale-IV and found Heim's memory scores were "quite high and would seem to contradict a measurable organically-based memory problem." He noted that "unlike her performance on the initial screening tests, she was perfectly capable of dealing with verbal stimuli." He also administered the Beck Depression Inventory-II which showed a "virtual absence of depression" and he found that depression could not be the cause of her cognitive difficulties. Dr. Delfin concluded that she was a "cognitively intact individual who is having what may well be benign, age-related 'senior moments' complicated by fatigue from her illness."

7

Dr. George's February 15, 2009 letter noted Heim's "history of immune peripheral neuropathy years ago" and her "chronically positive ANA test." He stated:

> The fatigue has become so severe that it prevents consistent daily employment of any kind.  The fatigue is highly variable, but is severe most days.  We have attempted a number of medical approaches, including aggressive immunosuppressive theapy [sic], without success.  The fatigue has a significant impact upon physical and mental function.  I believe that her current problem precludes current employment and, based upon the history over the past year, I anticipate that it will be an ongoing problem.

Dr. George's office-visit note of April 6, 2009, remarks that Heim reported increasing flu-like episodes, increased aching, and poor sleep.  He found that she had no new neuropathic symptoms and stable cognition and noted that her psychological test was negative.

A LINA medical director reviewed Heim's records.  He concluded that despite the rise in ANA levels, she had no demonstrated effect of fatigue but only her own "subjective complaints about lack of energy."  (SOF ¶ 25.)  He noted no documented measurable loss of strength or motion and that neuropsychological testing did not support a cognitive impairment.

LINA upheld its denial of Heim's claim by letter dated April 17, 2009, citing "no significant findings to support the limitations that would preclude [Heim] from performing [her] own occupation."  LINA stated:

> Although you have complaints of fatigue, the office notes from Dr. George report that on examination you were well developed, well nourished and in no acute distress.  There is no documentation that you appeared fatigued or had observable cognitive deficits as a result of the fatigue.  In addition, there was no indication that your fatigue was impairing your functionality.  You also had complaints of cognitive difficulties; however, the evaluation performed by Dr. Delfin on January 29, 2009 concluded that you were cognitively intact.

> While we respect the opinion of all medical providers, in order to be eligible for Long Term Disability benefits, we must be provided with the clinical documentation upon which their opinions are based.

_____**C. Second Appeal**

Heim appealed again on June 21, 2009, and requested an independent medical examination ("IME").  A LINA claim manager, James Sharp, contacted Heim regarding her request for an IME and advised her to accept a peer review instead.  Heim consented to a peer review so long as Dr. George was contacted as part of the process.  Heim also submitted another letter from Dr. George dated May 24, 2009 summarizing her functional limitations.  Dr. George noted that she "has experienced profound fatigue whihc [sic] has made it impossible to consistently function at a level that would allow any gainful employment."  He listed a number of limitations, noting morning fatigue after a full night's sleep, unpredictable functional capacity, the need to rest after grocery shopping and to modify meals to minimize preparation time, as well as an affected ability to concentrate.  He concluded:

> The fatigue problems do not express themselves by specific physical findings.
> This is not expected.  The patient's reports are quite consistent and support the
> development of a chronic severe fatigue state.  Medical science has not yet
> defined the nature of this problem, which is well beyond the range of the fatigue
> experience of the average person.

LINA referred Heim's appeal to an independent peer review performed by Dr. Harvey A. Schwartz, who is board certified in internal medicine, rheumatology, and allergy/immunology. The referral notice stated that Heim's claim had been denied because "there was insufficient clinical evidence to support the severity of restrictions or documented loss of function" and indicated that surveillance had not been done.

Dr. Schwartz reviewed Heim's medical records and contacted Dr. George.  Dr. Schwartz found that Dr. George's imposed restrictions were not supported, noting that Dr. George had not directly observed any of Heim's symptoms but based his opinions on Heim's statements made to

him and  that his office visits contained no "medical evidence" of cognitive dysfunction or of

obvious fatigue manifestations.  Dr. Schwartz also noted that the July 2008 MRI was nonspecific

and benign, and that Heim had an "essentially normal" neuropsychological evaluation.

LINA's August 19, 2009 letter denying Heim's appeal noted that her position was a

"medium duty occupation" and reviewed only the physical demands of her job.  LINA

concluded:

> [W]e have not been provided with any clinical findings to support the limitations
> that would preclude you from performing your own occupation.  While Dr.
> George has indicated that you experience profound fatigue, there is no clinical
> documentation to support a level of fatigue or loss of function to preclude you
> from performing your regular occupation since July 29, 2008.

Heim then filed her complaint with this court alleging that the denial of her benefits claim

was arbitrary and capricious and unsupported by the evidence.

## II.  SUMMARY JUDGMENT STANDARD

The parties have filed cross-motions for summary judgment.  "Cross-motions are no more

than a claim by each side that it alone is entitled to summary judgment, and the making of such

inherently contradictory claims does not constitute an agreement that if one is rejected the other

is necessarily justified or that the losing party waives judicial consideration and determination

whether genuine issues of material fact exist."  *Lawrence v. City of Philadelphia*, 527 F.3d 299,

310 (3d Cir. 2008) (*quoting Rains v. Cascade Indus., Inc*., 402 F.2d 241, 245 (3d Cir. 1968)).

"[T]he Court must rule on each party's motion on an individual and separate basis, determining,

for each side, whether a judgment may be entered in accordance with the summary judgment

standard."  *Marciniak v. Prudential Fin. Ins. Co. of Am.*, 184 F. Appx 266, 270 (3d Cir. 2006).

## III.  DISCUSSION

The burden of proving a disability rests on Heim as the person seeking benefits.  LINA asserts that it properly denied Heim's claim because she failed to provide sufficient proof of disability,  specifically objective proof of disability.[7]  Heim asserts that LINA abused its discretion and arbitrarily denied her claim because LINA: (1) improperly required her to provide objective evidence of her disability and rejected all subjective reports of pain and fatigue; (2) failed to conduct an independent examination and disregarded her treating physician's opinion; and (3) failed to properly evaluate Heim's ability to perform her job.

I review the claim under the de novo standard.  LINA's policy states the insured "must provide the Insurance Company . . . satisfactory-proof of Disability before benefits will he paid. . . .  The Insurance Company will require continued proof of the Employee's Disability for benefits to continue."  The de novo standard of review applies "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to

---

[7] LINA also argued that Heim failed to submit any proof that she was disabled during the policy's required "elimination period."  It argues that Heim was required to show she was disabled for ninety days before being eligible to receive disability benefits.  That period was between July 28, 2008 and October 26, 2008.  LINA acknowledges that Heim submitted a November 3, 2008 report by Dr. George stating Heim's regular daily function was limited by her cognitive impairments and fatigue and that she was unable to work.  Heim also submitted Dr. George's office visit notes covering the relevant period, stating: (1) she "*continues* to have problems with marked fatigue, arthralgias, cognitive difficulties which is making daily function most difficult" (July 25, 2008); (2) her cognitive problems were continuing and that he would plan for formal neuropsychological testing if they persisted (August 21, 2008); and (3) that she "may have some central neurologic dysfunction with cognitive impairment," her concentration was a bit better, her memory was no better, that she had a couple good weeks but had a very bad past week with stiffness and pain (October 23, 2008).

LINA's argument regarding the elimination period therefore does not merit separate discussion because it is identical to LINA's argument that she did not submit satisfactory proof, not no proof at all, of her disability.

construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).

As I explained in my December 22, 2010 memorandum addressing the proper standard of review,

the requirement of "satisfactory proof" does not confer discretionary authority. *See also, Viera v.*

*Life Ins. Co. of N. Am.,* 642 F.3d 407 (3d Cir. Pa. 2011) (evaluating a LINA policy and finding

"the mere requirement to submit 'satisfactory proof' does not confer discretion upon an

administrator").

When exercising de novo review, "the role of the court 'is to determine whether the

administrator . . . made a correct decision.' . . . 'The  administrator's decision is accorded no

deference or presumption of correctness.' . . .   The court must review the record and 'determine

whether the administrator properly interpreted the plan and whether the insured was entitled to

benefits under the plan.'" *Viera*, 642 F.3d at 413-414 (3d Cir. Pa. 2011)(internal citations

omitted).

## A.  LINA May Not Require Objective Evidence to Prove a Subjective Condition

LINA denied Heim's claim for her failure to "provide *clinical evidence* of [her]

functional impairment."[8] Dec. 22, 2008 LINA Denial Letter (LH 00315) (emphasis added).  In

doing so, LINA declined to credit Heim's reports of pain and fatigue as well as Dr. George's

finding that "cognitive impairment and fatigue limit regular daily function of any kind" rendering

Heim "unable to perform due to cognitive problems."  LINA refused to credit Dr. George's

opinion because he relied "on [Heim's] statements and *not on objective evidence* either that he

---

[8] LINA used slightly different language in its subsequent denials.  When denying Heim's
first appeal, LINA cited a lack of "significant findings" and it denied her second appeal because
of an absence of  "clinical findings" that would "support the limitations that would preclude
[Heim] from performing [her] own occupation."   Apr. 17, 2009 LINA Denial Letter (LH 00165);
Aug. 19, 2009 LINA Denial Letter (LH 00157).

has observed or that the psychologist, Dr. Delfin, observed." LH 00225 (emphasis added). In LINA's motion for summary judgment, it argues that "[w]ithout some *objective measurement* of [Heim's] functional limitations, [it] had no way to determine whether she was impaired to the point she could not perform her job." Def.'s MSJ at 14 (emphasis added).

The Third Circuit has held it was arbitrary and capricious for a plan administrator to deny a plaintiff's disability benefits claim based on the plaintiff's failure to provide objective medical evidence of his inability to work where he suffered from chronic fatigue syndrome ("CFS"). *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3d Cir. 1997). Mitchell's treating doctor wrote a letter to the plan administrator stating Mitchell was diagnosed with chronic fatigue and that he was "physically incapable of increased or sustained activity." In a later letter, his doctor cited Mitchell's symptoms of "fatigue, fevers, joint pain, muscle pain, sore throats, markedly decreased concentration, headaches, muscle weakness and occasional sleep problems" and found that he was "100% disabled . . . and work for him is out of the question." The plan administrator, however, denied his claim stating that his file "indicates that [he is] suffering from fatigue, but does not contain objective medical evidence that [his] condition made [him] totally and continuously unable to engage in *any* substantial gainful work for which [he was] qualified." *Id*. at 442, n.8.

The court held that the denial of benefits was arbitrary and capricious because:

the undisputed evidence from Mitchell's physicians indicates that Mitchell has suffered severe CFS symptoms that have precluded him from engaging in any substantial gainful work since January 1989. [The plan administrator] has identified no more "objective" evidence that Mitchell could have submitted, in addition to his doctors' observations, to support his claim that his fatigue and loss of concentration were sufficiently severe to prevent him from engaging in gainful work.

13

*Id.* at 442.  Although the Court referenced the doctor's "observations," there is no indication that the doctor in *Mitchell*, just as Dr. George here, actually saw the symptoms he described.[9]

LINA does not question that Heim has Sjogren's syndrome and fatigue.  Def's Opp. To Plf's MSJ at 6.  Instead, LINA asserts that it "requested that [Heim] submit evidence not of her condition *or her symptoms* but *of her Disability*, as required by the Policy."  *Id.* (bolded emphasis in original).  LINA relies on this distinction "between 'requiring objective proof that the claimant has a condition with objective proof that a particular condition is disabling.'" *Wernicki-Stevens v. Reliance Std. Life Ins. Co.*, 641 F. Supp. 2d 418, 426 (E.D. Pa. 2009).

In *Wernicki-Stevens*, the court applied the "deferential arbitrary and capricious standard of review" in evaluating the plaintiff's claim that her disability benefits had been improperly terminated after eight years.  The plan administrator conducted a two-day Functional Capacity Exam ("FCE") and relied on the that exam to conclude the plaintiff no longer met the policy definition of disability.  The court clarified it was distinguishing between offering an "FCE as proof that Plaintiff suffers from the litany of ailments described in her complaint, but rather as proof that, despite these symptoms, Plaintiff is capable of performing full-time sedentary work with restrictions." *Id.* at 426.[10]

_____

[9] For example, the Court notes that "Mitchell's medical records indicate that *he* began complaining of fatigue, fever, a persistent cough, and other flu-like symptoms."  *Id.* at 440 (emphasis added).  The Court also quoted from Mitchell's treating physician's letters explaining CFS, noting that "[t]he frequency and severity of symptoms in patients with the Chronic Fatigue Syndrome vary greatly and can wax and wane. There is no pattern to the cycle, and unfortunately it is difficult to say when he will have good days or bad days."  *Id.* at 441.

[10] LINA also cites *Nichols v. Verizon Commc'ns Inc.*, 78 Fed. Appx. 209 (3d Cir. 2003), noting the court found that a denial based on "the lack of objective tests demonstrating the existence of [a plaintiff's] *symptoms*," could be a potentially reasonable request given the circumstances.  However, unlike in Heim's case, the *Nichols* court upheld the denial of benefits

However, other courts in this district have recognized the problem inherent in requiring objective evidence of the *symptoms* or bases of diagnoses for which there are no objective tests, such as chronic fatigue.  For example, in *Klinger*, the defendant denied plaintiff's benefits after an independent physician reviewed plaintiff's records and found her CFS diagnosis was unsupported by objective evidence.  *Klinger v. Verizon Commc'ns, Inc.*, No. 05-CV-5312, 2007 U.S. Dist. LEXIS 18563 (E.D. Pa. Mar. 16, 2007).  The court noted the facts were common to those in *Mitchell*, including that the "the plaintiff provided multiple letters from a treating physician" and that "the Social Security Administration granted plaintiff disability benefits."  *Id.* at *5-6.  The court found:

> Defendants attempt to distinguish *Mitchell* by making a distinction between objective evidence of a CFS *diagnosis* and objective evidence of CFS *symptoms*. This attempt fails because *Mitchell* considered and rejected the diagnosis/symptoms distinction. . . . [I]f the *Mitchell* plan administrator required objective evidence of "the extent to which" the plaintiff experienced his symptoms, that requirement was arbitrary and capricious.

*Id.* at *6-7.  *See also, Elms v. Prudential Ins. Co. of Am.*, 2008 U.S. Dist. LEXIS 76917, *53, n.1 (E.D. Pa. Oct. 2, 2008) (noting "plan administrators must be wary of denying claims because of a lack of objective evidence when the disabling condition on which the claimant rests her case rests heavily on subjective evidence"); *Cohen v. Std. Ins. Co.*, 155 F. Supp. 2d 346, 354 (E.D. Pa. 2001) (rejecting defendant's denial of benefits because it was based on a lack of objective medical evidence and the Plan did not require disability be proved by objective medical evidence).

---

under the highly deferential arbitrary and capricious standard citing conflicting opinions by numerous doctors where the plaintiff, who was diagnosed with CFS, was examined by a plan administrator doctor and a vocational review was performed.  *Id.* at 211.

Still other courts have rejected the attempt to distinguish between a diagnosis and evidence of symptoms where the diagnosis is conceded but only the ability to perform the job is questioned.  For example, in *Brown v. Continental Casualty Co.*, 348 F. Supp. 2d 358, 369 (E.D. Pa. 2004), the court found reliance on the "lack of objectively-proven physical impairments or defects" to be unconvincing in light of the subjective nature of the plaintiff's disability of fibromyalgia.  In *Brown*, just as here, the defendant did not dispute the plaintiff's diagnosis, but claimed instead that the plaintiff "failed to provide sufficient *detail* of her fibromyalgia's effects on her capacity to work: 'evidence of [her] loss of functionality.'" *Id.*  The court found that a requirement of objective evidence "would effectively preclude any fibromyalgia patient from qualifying as totally disabled on the basis of the disease."  *Id.*  Citing *Mitchell*, the court noted that it was not permissible "to require objective evidence of diseases for which such evidence is simply unavailable." *Id.* at 370.

A plan administrator cannot refuse to consider subjective reports of pain.  In *Engel*, the court rejected the plan administrator's conclusion "that the medical records '[do not] support . . . restrictions and limitations to render her unable to perform the main duties of her occupation as a director of clinical services.'" No. 08-240, 2009 U.S. Dist. LEXIS 89396, *36 (W.D. Pa. Sept. 28, 2009)(alteration in original).  The *Engel* court found error in this approach because the "Defendant consistently rejected the Plaintiff's subjective reports as to the nature and severity of her chronic fatigue and memory and concentration problems without a reasonable basis." *Id.* at *48.  *See also, Glenn v. MetLife*, 461 F.3d 660 (6th Cir. 2006) (holding denial of benefits was arbitrary and rejecting MetLife's dismissal of stress "as an improperly documented, subjective, and irrelevant factor in its disability determination" where MetLife relied on an independent

16

physician review that disregarded the plaintiff's stress as entirely self-reported); *Adams v. Metro. Life Ins. Co.*, 549 F. Supp. 2d 775, 792-793 (M.D. La. 2007) (finding administrator improperly denied benefits where "defendant offers no basis to challenge the plaintiff's subjective accounts of her chronic headaches or the medical opinions that have documented her headaches").

LINA does not dispute that Heim has been diagnosed with Sjogren's syndrome and has experienced fatigue. LINA has also acknowledged that there are no diagnostic tests for pain or fatigue and that its policy does not require objective or clinical evidence to prove disability. (Sharp Dep. at 11-12). Furthermore, LINA did not question Heim's veracity regarding her complaints of fatigue and joint pain. (Sharp Dep. at 16.) Nonetheless, LINA declined to consider Heim's subjective reports of such pain and fatigue, instead insisting on "clinical documentation" and "clinical findings." LINA also failed to credit Dr. George's opinion as a clinical finding because it was based on Heim's reports of pain and fatigue. This was improper.

### B. Weighing A Treating Physician's Opinion and LINA's Decision Not To Conduct an IME

By finding that Heim failed to present evidence that she cannot function at her job, LINA disagreed with her treating physician who found that Heim "has experienced profound fatigue whihc [sic] has made it impossible to consistently function at a level that would allow any gainful employment." It is true, as LINA points out, that a treating physician's opinion is not above challenge. However, where a disease cannot be verified by objective tests, courts have found that "the reports of treating physicians, as well as the testimony of the claimant, become even more important in the calculus for making a disability determination." *Perl v. Barnhart*, 2005 U.S. Dist. LEXIS 3776, *11 (E.D. Pa. Mar. 10, 2005) (evaluating appeal of denial of disability benefits where plaintiff suffered from fibromyalgia). Furthermore, in *Brown*, the court

17

noted that "[d]irect contact with a patient over an extended period of time seems especially important for reliable evaluation of a disease as subjective and variable as fibromyalgia, since it can allow more thorough examination of the patient's credibility and true range of abilities."  348 F. Supp. 2d at 368.

I am free to weigh LINA's decision not to conduct an IME under the circumstances presented here.  *See e.g., Morgan v. Prudential Ins. Co. of Am.*, 755 F. Supp. 2d 639, 647 (E.D. Pa. 2010) ("absence of an examination is a factor in analyzing the differences in the opinions of the consultant and the treating physician").   In *Morgan*, the court found that "where the insured's treating physician's disability opinion is unequivocal and based on a long term physician-patient relationship, reliance on a non-examining physician's opinion premised on a records review alone is suspect and suggests that the insurer is looking for a reason to deny benefits."  *See also, Mishler v. Met. Life Ins. Co.*, 2007 U.S. Dist. LEXIS 10403, *20 (E.D. Mich. Feb. 15, 2007) ("Performing a file review when a plan provides a right to an independent medical examination can raise a question about the thoroughness or accuracy of a benefits determination").

LINA's medical reviewers did not examine Heim, but instead relied on reviews of her file and one conversation with her treating physician.  Heim requested an IME in her June 21, 2009 letter, where she stated that it was obvious that LINA disbelieved her claim that she has "disabling fatigue, and polyarthralgia that significantly impairs [her] ability to function on a daily basis."  Although LINA repeatedly emphasizes in its brief that Heim "*agreed*" to a peer review instead of an IME, it fails to note that she so agreed only after LINA's claim manager, Sharp,

advised her that a peer review was more appropriate than an IME.[11]  (LH 00014.)  Notably, Sharp

justified his recommendation not to perform an IME because Heim was "claiming disability from

fatigue and polyarthralgia, *which would be hard to document on a day to day basis*."  LH 00019

(emphasis added).  This rationale directly contradicts and undermines LINA's rejection of Dr.

George's opinion because he did not directly observe Heim's fatigue at her office visits.

Setting that contradiction aside, LINA's argument that its decision not to conduct an IME

is irrelevant in this case is further undercut by the caselaw to which it cites.  LINA relies on

*Gigante v. Prudential Ins. Co. of Am.*, No. 04-0780, 2005 U.S. Dist. LEXIS 36568 (E.D. Pa.

Mar. 22, 2005), and the cases cited therein, to support its assertion that an IME was not

necessary, and thus irrelevant to LINA's denial of Heim's claim.  In *Gigante*, however, the court

explicitly criticized the plan administrator and instructed that "an administrator should not place

such a strong emphasis on objective evidence to the exclusion of all subjective evidence."

The policy clearly did not require that LINA conduct an IME and the examination would

not have necessarily been determinative or even significant in assessing LINA's denial of

benefits or Heim's disability status.  It would, however, have provided additional information for

use in analyzing Heim's claim for benefits.  Given the specific circumstances here – where the

claim was based on subjective complaints, LINA rejected Heim's treating physician's opinion as

lacking objective evidence, and Heim requested an IME because she felt LINA did not believe

---

[11] On LINA's appeal process form, Sharp noted that he "discussed with [Heim] that Independent Medical Examination would not be appropriate for this review."  Sharp's call summary dated July 15, 2009 states that he advised against an IME.  He stated that Heim "asked [Sharp] what [he] proposed, at which time [he] suggested that [he] would like to have a Peer Review completed with a Rheumatologist who could look at the clinical records and contact Dr. George to have a discussion regarding her functional abilities."  LH 00019.

her – LINA's reliance on peer reviews without any examination or assessment of Heim

contributes to my finding that LINA improperly denied Heim's claim for benefits.

### C.  LINA Failed to Properly Evaluate Heim's Ability to Perform Her Job

LINA's policy defined disability according to the participant's ability to perform her

"regular occupation."  The Third Circuit has found that "it is essential that any rational decision

to terminate disability benefits under an own-occupation plan consider whether the claimant can

actually perform the specific job requirements of a position."  *Miller v. Am. Airlines, Inc.*, 632

F.3d 837, 855 (3d Cir. 2011).  It is therefore necessary to first assess the employee's job

requirements and then evaluate her ability to perform those requirements.

### 1.  LINA Did Not Review Heim's Specific Job Requirements

The policy explains, as noted by LINA in its motion for summary judgment, that LINA

"will consider the duties of the occupation as it is normally performed in the general labor market

in the national economy."   However, LINA's initial denial letter repeatedly states that Heim did

not support restrictions that would preclude her from performing her "regular occupation"

without ever noting that occupation or its demands, let alone evaluating her ability to perform

such duties.  In its two subsequent denial letters, LINA described Heim's position as "a medium

duty occupation," but reviewed only the physical demands of a medium duty job.  LINA said

nothing of the mental requirements of a medium duty position or the actual demands of Heim's

specific position.

Despite the cursory mention of Heim's job description in LINA's denial letters, LINA has

an "Occupational Description" and an "Occupational Requirements" form setting forth the

specifics of an "RN III" position.  Those forms state that she was required to administer

prescribed medications, assist physicians during treatments and examinations of patients, observe patients and record conditions and reactions to drugs and treatments, and to take vital signs of patients.  The job also entailed "Dealing with people; Attaining precise set limits, tolerances, and standards; Making judgments and decisions; [and] Performing effectively under stress."  LH 00284-85.  In addition, the Reading Hospital job description lists seven paragraphs of "Work Outcomes and Behaviors," describing the need for clinical judgment, collaboration, advocacy and clinical inquiry, among other responsibilities.  LH 00424.

In Heim's initial appeal, she informed LINA that she had worked as a Cardiac Rehabilitation Nurse since 2001.  She stated that she was the sole registered nurse in the Cardiac Rehabilitation suite where she was responsible for handling patient medical complaints and problems as well as emergencies that included life-threatening conditions.  She explained: "My job was moderately physically strenuous and highly mentally stressful.  As the cardiac rehabilitation nurse I was required to have the ability to think quickly and accurately, and to possess extraordinary critical thinking ability as well as the ability to make split second decisions and carry them out."  LH 00257.

The Honorable Mitchell S. Goldberg found in a similar matter that "LINA's failure to consider Plaintiff's specific job demands is a significant oversight and suggests that its termination decision 'was not reasoned and based on an individualized assessment' of her abilities." *Loomis v. Life Ins. Co. of N. Am.*, No. 09-3616, 2011 U.S. Dist. LEXIS 66636, *14 (E.D. Pa. June 21, 2011).  I agree and find that LINA's failure to consider Heim's specific job functions reflects a failure to properly interpret its plan and contributes to its erroneous denial of benefits.

21

### 2.  LINA Did Not Evaluate Heim's Functional Capacity

In addition to considering a claimant's specific job requirements, the plan administrator

must also assess the claimant's ability to perform those requirements in light of his or her

disabilities.  For example, in *Lamanna v. Special Agents Mut. Benefits Ass'n,*, the court found a

denial of benefits improper, noting it was significant that there was no evidence the plan

administrator had "itself performed any type of work analysis vis-a-vis her medical limitations."

546 F. Supp. 2d 261, 297 (W.D. Pa. 2008).  The court held that the plan administrator's

conclusion that the plaintiff could return to work was "unfounded in the absence of evidence

such as rational analyses from the IMEs, objective examinations such as FCEs [Functional

Capacity Exams], or job skill transferability evaluations."  *Id.*

Similarly, in *Engel,* the court held it was an abuse of discretion to fail to properly

consider evidence of the plaintiff's specific job responsibilities.  The court found:

> Although Defendant requested a copy of the Plaintiff's job description, it did not give
> meaningful consideration as to how the Plaintiff's chronic fatigue, as well as memory and
> concentration problems, would impact upon her performance.  As a supervisor, Plaintiff
> was required to function in a stressful environment which required constant interaction
> with subordinates and others, and the daily utilization of verbal and written
> communication skills.  Given the nature of her responsibilities, the impact caused by her
> chronic fatigue and memory and concentration problems would be significant.

*Id.* at *49-50.  *See also, Kosiba v. Merck & Co.*, 2011 U.S. Dist. LEXIS 23247, *46-47, n.20.

(D.N.J. Mar. 7, 2011) (rejecting defendant's conclusion that plaintiff could return to work in light

of difficulty of providing objective medical evidence of fibromyalgia and because "nowhere in

any termination letter does [defendant] suggest that [plaintiff] obtain an FCA herself to

objectively demonstrate the effect of her disabilities").

Here, Heim explained to LINA how her disability impacted her job, noting a "significant

decrease in [her] ability to recall information that [she] has known her entire career, for example, drug doses." LINA's denial letters, however, do not discuss any of the requirements noted in its occupational description of Heim's job or address her reports of cognitive problems, fatigue or her Sjogren's syndrome in relation to these requirements. Instead, LINA concluded without analysis or even comment that Heim was not precluded from performing her occupation. Furthermore, despite Heim's request for an IME in the face of what she called LINA's obvious disbelief of her symptoms, LINA advised her to agree to a peer review and never conducted an IME, functional capacity exam or vocational assessment of any kind.

I find that LINA failed to provide a reasoned denial of Heim's claim. LINA did not review the full range of requirements of Heim's occupation and did not relate those requirements to her diagnoses, which it concedes, or to her symptoms, which it unreasonably rejects as lacking any objective medical bases. LINA made absolutely no attempt to establish Heim's physical or mental capabilities by way of an IME, a vocational assessment, a functional capacity exam, or any other means. Instead, LINA simply rejected her reports of pain and fatigue, ignored the Social Security Administration's determination that she is disabled, and declared she was able to perform the "essential duties of her job" without ever noting those duties or explaining how her symptoms would impact her responsibilities.

LINA's motion for summary judgment shall therefore be denied.

## IV.  HEIM'S MOTION FOR SUMMARY JUDGMENT AND REMEDIES

Heim seeks an award of disability benefits, costs, interest and attorney's fees. In view of the fact that LINA's motion for summary judgment is denied, it is in my discretion to either remand the case to LINA for a renewed evaluation or to award retroactive benefits. *See e.g.,*

*Kaelin v. Tenet Emple. Benefit Plan*, No. 04-2871, 2006 U.S. Dist. LEXIS 57433, *10 (E.D. Pa.

Aug. 16, 2006).

## A.  Award of Benefits

I find Heim was entitled to benefits under the plan and will award retroactive benefits

beginning on October 27, 2008.[12]  In so deciding, I am aware of the Third Circuit's decision in

*Miller v. American Airlines, Inc.*, 632 F.3d 837, 856 (3d Cir. Pa. 2011), discussing remedies in

claims regarding disability benefits and distinguishing between claims involving an initial denial

of benefits and a termination of benefits.  The *Miller* court found that where benefits are

improperly terminated, the remedy must be reinstatement of benefits.  The court also noted that

where "benefits are improperly denied at the outset, it is appropriate to remand to the

administrator for full consideration of whether the claimant is disabled."  *Id*. at 856-57. *Miller*,

however, addressed a claim under the arbitrary and capricious standard of review, not the de

novo standard applied here, and was a termination of benefits case, unlike here where LINA

denied Heim's claim from the outset.

Appropriate, however, does not mean required.  I find that in a case such as this one,

where Heim has provided the policy-required  "satisfactory proof"  that she is disabled, benefits

must be awarded.

Here, Heim provided a detailed report of her pain and fatigue, describing an increase in

symptoms beginning in the summer of 2007.  She is not able to get out of bed on particularly bad

days, has problems concentrating and remembering tasks, struggles with multitasking, suffers

---

[12] The 90-day elimination period ended on October 26, 2008 as calculated from Heim's
last day of employment on July 28, 2008.

24

from dry eyes, and cannot make plans in advance because of unpredictable onsets of severe fatigue.  Heim's treating physician found her statements to be credible and LINA did not question Heim's veracity.

In addition, Heim provided the medical records of her treating doctor reflecting continued fatigue, arthralgia, reports of cognitive impairment, and attempts to remedy her condition.  *See e.g.,* July 3, 2008 Office Notes (reflecting positive response in strength and endurance with Prednisone, but worsening of fatigue and arthralgias and ongoing difficulties with concentration and memory) (LH 00337-39); Oct. 23, 2008 Office Notes (reflecting varied pain and energy, improvement in concentration but not in memory, unsteady Romberg, and mildly reduced sensation in fingers and toes) (LH 00262); Jan. 24, 2009 Office Notes (noting ANA test on Jan. 24, 2009 of 1: 2560) (LH 00275); Dr. George's Feb. 15, 2009 letter (noting fatigue is having a significant impact on Heim's physical and mental function and that medical approaches, including aggressive immunosuppressive therapy, were unsuccessful) (LH 00260); April 6, 2009 Office Notes (noting reports of flulike symptoms, aching, and no new neuropathic symptoms) (LH 00252); Dr. George's May 24, 2009 letter (noting Heim's consistent reports of and impact of fatigue) (LH 00233).

Heim's January 2009 neurological review did result in the "impression" that she is "neurologically intact," but the psychologist, Dr. Delfin, noted her condition was "complicated by fatigue from her illness."  Dr. Delfin indicated that she was capable of dealing with verbal stimuli, but noted this finding was unlike her "performance on the initial screening tests" which he did not explain.  The nonspecific finding of Heim's July 2008 MRI does not weigh for or against a determination of disability.

Dr. George was aware of all of these reports when he found Heim to be disabled.

Furthermore, the Social Security Administration found that Heim is disabled.  LINA is correct in noting that I am not bound by this finding.  However, it may be considered in my analysis and has been found to be "highly significant" in cases such as this one, where the disability determination was concurrent with the application for LTD benefits, the plaintiff claimed disability based on pain, and the plan administrator, like LINA, was made aware of the Social Security disability determination and did not explain its departure from that determination.[13]  *See Michaux v. Bayer Corp.*, No. 05-1430, 2006 U.S. Dist. LEXIS 46646, *34 (D.N.J. June 30, 2006); *see also, Brown v. Continental Casualty Co.*, 348 F. Supp. 2d 358, (E.D. Pa. 2004) (finding disability determination had "persuasive weight in conjunction with other evidence"); *Post v. Hartford Ins. Co.*, 501 F.3d. 154, 167 (3d Cir. 2007) (finding disagreement with Social Security benefits determination "relevant though not dispositive" in assessing termination of benefits).

In *Michaux*, the court vacated the denial of benefits because the administrator failed to analyze the favorable Social Security disability determination.  The court noted that  when "a Social Security disability claim is based upon disabling pain, the claimant must show medical signs and objective test results that would support the causation of pain; hence, if the claimant's disability is based on pain, there necessarily had to be a conclusion by the Social Security Administration that it had an objective medical basis, something the [plan administrator] claimed was absent from the record here."  *Id.* at *34-35.

_____

[13] Sharp testified that the Social Security award of disability benefits did not effect his decision in any way and that he did not attempt to explain why LINA did not follow the Social Security disability determination.  Sharp Dep. at 36:6-37:4.

Heim's position as a cardiac nurse, as described above, requires her to work with precision and exercise clinical judgment in caring for patients in a stressful environment. Heim's treating physician, Dr. George, found her to be unable to work, citing her medical history and unsuccessful attempts to treat her symptoms. LINA failed to properly refute Dr. George's opinion and did not explain why it failed to follow (or how it disagreed) with the Social Security Administration's determination that Heim is totally disabled, a determination reached just three months after she applied to LINA for LTD benefits and prior to the initial denial of her claim.

I therefore find that Heim provided satisfactory proof, as required by her policy, that she was unable to perform her regular occupation due to sickness. She is thus entitled to disability benefits, to be offset – as required by the policy – by the social security disability benefits that she received , for the twenty four months following her application for benefits.

### B.  Remand Disability Determination Under The "Any Occupation" Standard

In order for Heim to continue to receive disability benefits after twenty-four months, the policy requires that she be unable to perform the material duties of *any* occupation for which she may be qualified. The parties' briefs address Heim's ability to perform *her own* occupation and do not discuss her ability to perform *any* occupation.  I will therefore remand the case to LINA for determination of whether Heim was disabled as of October 27, 2010, the date the "any occupation" standard would have taken effect. *See e.g., Loomis v. LINA*, No. 09-3616, 2011 U.S. Dist. LEXIS 66636, *22 (E.D. Pa. June 21, 2011) (reinstating benefits through twenty-four-month period and remanding for determination of disability under "any occupation" standard).

### C.  Fees and Costs

A prevailing party is entitled to file a petition for attorney's fees and costs. To evaluate

27

whether a prevailing plaintiff in an ERISA case should receive an award of attorneys' fees I must consider the following five factors: (1) the offending parties' culpability or bad faith; (2) the ability of the offending parties to satisfy an award of attorneys' fees; (3) the deterrent effect of an award of attorneys' fees against the offending parties; (4) the benefit conferred on members of the pension plan as a whole; and (5) the relative merits of the parties' position. *Ursic v. Bethlehem Mines*, 719 F2d 670, 673 (3d Cir. 1983).  Similarly, an award of costs is at the discretion of the court where they are reasonable and reimbursable.

I will therefore permit Heim to file such a petition if she so chooses.

## V.  CONCLUSION

I find that LINA improperly denied Heim's claim for benefits and that Heim established she is disabled from performing her own job.  Because neither party discussed Heim's disability status under the "any occupation" standard applicable after twenty-four months of disability payments, I remand the case to LINA for determination of Heim's eligibility as of October 27, 2010.

An appropriate order follows.